# In the United States Court of Appeals for the Ninth Circuit

SIERRA CLUB; SOUTHERN BORDER COMMUNITIES COALITION,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, President of the United States, in his official capacity; PATRICK M. SHANAHAN, Acting Secretary of Defense, in his official capacity; KEVIN K. MCALEENAN, Acting Secretary of Homeland Security, in his official capacity; and STEVEN MNUCHIN, Secretary of the Treasury, in his official capacity,

*Defendants-Appellants.*

## APPELLEES' OPPOSITION TO APPELLANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL

On Appeal from the United States District Court
for the Northern District of California
Case No. 4:19-cv-892-HSG

Dror Ladin
Noor Zafar
Jonathan Hafetz
Hina Shamsi
Omar C. Jadwat
American Civil Liberties Union
    Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500

Cecillia D. Wang
American Civil Liberties Union
    Foundation
39 Drumm Street
San Francisco, CA 94111
Tel.: (415) 343-0770

*Attorneys for Plaintiffs-Appellees*
*(Additional Counsel on Next Page)*

Mollie M. Lee
Christine P. Sun
American Civil Liberties Union
   Foundation of Northern
   California, Inc.
39 Drumm Street
San Francisco, CA 94111
Tel.: (415) 621-2493

David Donatti
Andre I. Segura
American Civil Liberties Union
   Foundation of Texas
P.O. Box 8306
Houston, TX 77288
Tel.: (713) 325-7011

Sanjay Narayan*
Gloria D. Smith*
Sierra Club Environmental Law
   Program
2101 Webster Street, Suite 1300
Oakland, CA 94612
Tel.: (415) 977-5772

*Attorneys for Plaintiffs-Appellees*

*Attorneys for Plaintiff-Appellee
Sierra Club*

## CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellees are non-profit entities that do not have parent corporations. No publicly held corporation owns 10 percent or more of any stake or stock in Plaintiffs-Appellees.

*/s/ Dror Ladin*
Dror Ladin
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2500
F: (212) 549-2654

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

BACKGROUND .....................................................................................................2

ARGUMENT ..........................................................................................................4

      I.     Defendants Have Not Made a Strong Showing That They Are
Likely to Succeed on the Merits. ...............................................................4

            A.     Congress did not preclude review. ...............................................5

            B.     Defendants' plan to funnel $1 billion from the military
to wall construction in Arizona and New Mexico is
unlawful. ....................................................................................13

      II.    Defendants Have Not Shown Irreparable Harm. ................................19

      III.   The Equities and Public Interest Support the District Court's
Injunction. ...............................................................................................21

CONCLUSION .....................................................................................................24

CERTIFICATE OF SERVICE ..............................................................................26

CERTIFICATE OF COMPLIANCE .....................................................................27

# TABLE OF AUTHORITIES

## Cases

*Alto v. Black*,
   738 F.3d 1111 (9th Cir. 2013) ...............................................................8

*Chamber of Commerce v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) ...............................................................6

*Clarke v. Sec. Indus. Ass'n*,
   479 U.S. 388 (1987) ..............................................................................8, 9

*Clinton v. City of New York*,
   524 U.S. 417 (1998) .................................................................................18

*Clouser v. Espy*,
   42 F.3d 1522 (9th Cir. 1994) ...............................................................8

*Connecticut v. Schweiker*,
   684 F.2d 979 (D.C. Cir. 1982) .............................................................21

*Cook v. Billington*,
   737 F.3d 767 (D.C. Cir. 2013) ...............................................................7

*Cort v. Ash*,
   422 U.S. 66 (1975) ..................................................................................8

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) .................................................................................6

*Davis v. Mineta*,
   302 F.3d 1104 (10th Cir. 2002) ...........................................................21

*E. Bay Sanctuary Covenant v. Trump*,
   909 F.3d 1219 (9th Cir. 2018) .............................................. passim

*F.D.A. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) .................................................................................17

*Grupo Mexicano v. Desarrollo, S.A. v. All. Bond Fund, Inc.*,
   527 U.S. 308 (1999) .................................................................................7

*Haitian Refugee Ctr. v. Gracey*,
   809 F.2d 794 (D.C. Cir. 1987) ...............................................................6

*House v. Mnuchin*,
No. 19-cv-969 (D.D.C. May 23, 2019) .............................................................12

*Individuals for Responsible Gov't, Inc. v. Washoe Cty.*
*ex rel. Bd. of Cty. Comm'rs*,
110 F.3d 699 (9th Cir. 1997) .................................................................8

*Japan Whaling Ass'n. v. Am. Cetacean Soc'y*,
478 U.S. 221 (1986) ...............................................................................9

*Larson v. Domestic & Foreign Commerce Corp.*,
337 U.S. 682 (1949) ...............................................................................6

*League of Wilderness Defs./Blue Mountains Biodiversity*
*Project v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) ..................................................... 19, 23

*Leedom v. Kyne*,
358 U.S. 184 (1958) ...............................................................................6

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ...............................................................................7

*Lydo Enters., Inc. v. City of Las Vegas*,
745 F.2d 1211 (9th Cir. 1984) .........................................................20

*Mach Mining, LLC v. EEOC*,
135 S. Ct. 1645 (2015) .......................................................................12

*Maryland v. King*,
567 U.S. 1301 (2012) ..........................................................................22

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*
*v. Patchak*,
567 U.S. 209 (2012) ........................................................ 8, 10, 11, 12

*McDonnell v. United States*,
136 S. Ct. 2355 (2016) .......................................................................16

*Michigan v. E.P.A.*,
135 S. Ct. 2699 (2015) .......................................................................13

*Nevada v. Dep't of Energy*,
400 F.3d 9 (D.C. Cir. 2005) ..............................................................17

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*,
   465 F.3d 977 (9th Cir. 2006) ................................................................9

*Patchak v. Salazar*,
   632 F.3d 702 (D.C. Cir. 2011) .................................................. 10, 11

*Ray Charles Found. v. Robinson*,
   795 F.3d 1109 (9th Cir. 2015) ..............................................................7

*Sale v. Haitian Ctrs. Council, Inc.*,
   509 U.S. 155 (1993)..............................................................................6

*Sierra Club v. U.S. Forest Serv.*,
   843 F.2d 1190 (9th Cir. 1988) ...........................................................23

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) ..............................................................8

*United States v. McIntosh*,
   833 F.3d 1163 (9th Cir. 2016) ...........................................................18

*Util. Air Regulatory Grp. v. E.P.A.*,
   573 U.S. 302 (2014)............................................................................17

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) .......................................................4, 23

*White Stallion Energy Ctr., LLC v. E.P.A.*,
   748 F.3d 1222 (D.C. Cir. 2014) ........................................................13

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)................................................................................24

*Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health*,
   654 F.3d 919 (9th Cir. 2011) ................................................................8

## Statutes

6 U.S.C. § 202 ......................................................................................16

10 U.S.C. § 284................................................................................ passim

10 U.S.C § 2214 ...................................................................................13

2019 Department of Defense Appropriations Act, Pub. Law No. 115-245 .... passim

Consolidated Appropriations Act of 2019, Pub. Law No. 116-6 ................... 2, 5, 17

**Other Authorities**

DEA, 2018 National Drug Threat Assessment (Oct. 2018) ........................... 22, 23

H.R. Rep. No. 103-200 (1993).................................................................16

## INTRODUCTION

The President requested that Congress appropriate $5.7 billion for the Department of Homeland Security (DHS) to construct a wall on the border with Mexico. Congress denied that request, and the resulting impasse resulted in the longest government shutdown in U.S. history. Following the shutdown, Congress passed an appropriations act providing far less than the administration had sought. President Trump signed the law, but simultaneously announced he was "not happy with it" because Congress denied the requested wall funding.

Defendants now argue that the appropriations debate and shutdown were an empty exercise. According to Defendants, the entire sum of wall money the administration sought through the appropriations process was and remains available for wall construction all along—regardless of Congress's decision. Although Congress explicitly refused the administration's request to provide DHS with billions to fund wall construction, Defendants maintain they can funnel this money to DHS from various military accounts and achieve the same result.

Defendants seek an emergency order so that they may rush construction of a wall before their expedited appeal is heard. They argue that the ordinary appellate process must be set aside because the funds they seek to use "will no longer be available" once Congress has the opportunity to pass the military budget. But the order Defendants challenge simply maintains the status quo for the next few

weeks, as the district court has set a schedule that will permit a ruling on the merits on or about July 1. Defendants are not entitled to a stay.

## BACKGROUND

1. In December 2018, Congress refused to provide appropriations for the "President's desired border barrier funding and, due to this impasse, the United States entered into the nation's longest partial government shutdown." Order 4. On January 6, 2019, the administration formally requested $5.7 billion to construct "approximately 234 miles of new physical barrier." Order 4. As Congress debated the request, community and environmental organizations—including Plaintiffs—advocated with lawmakers to limit the scope and location of any construction. *See* Houle Decl. (ECF No. 33), (attached) ¶ 7; Gaubeca Decl. (ECF No. 32), (attached) ¶ 5.

On February 14, Congress denied the administration's request for billions of dollars in wall funds, instead passing the Consolidated Appropriations Act (CAA). "The CAA made available $1.375 billion—less than one quarter of the $5.7 billion sought by the President," Order 6, and restricted construction to eastern Texas; even within that area, Congress expressly protected certain ecologically sensitive lands, Pub. Law No. 116-6, Division A §§ 230-31.

2. On February 15, the President signed the CAA into law but announced that he was "not happy with it" and would rather build a wall across the border

"much faster" than Congress had provided for. Order 6. That same day, the White House "issued a fact sheet" explaining that it would spend an additional $6.7 billion "to build the border wall"—beyond the $1.375 billion Congress had appropriated. Order 7. This sum included "[u]p to $2.5 billion under the Department of Defense [(DoD)] funds transferred for Support for Counterdrug Activities." Order 7.

3. On February 25, eleven days after Congress refused to appropriate $5.7 billion to construct "approximately 234 miles of new physical barrier," DHS requested that DoD fund "approximately 218 miles" of new walls. *See* Rapuano Decl. (ECF No. 64-8), (attached to Motion), Ex. A at 10. On March 25, Defendant Shanahan agreed to fund an initial $1 billion in projects in Arizona and New Mexico, invoking Section 284.

4. Because DoD's counter-narcotics account contained less than a tenth of the $2.5 billion the administration announced it would funnel through the account to DHS, Defendant Shanahan "simultaneously invoked Section 8005 of the most-recent DoD appropriations act to 'reprogram' $1 billion from Army personnel funds to the counter-narcotics support budget." Order 9. "Since Defendants first announced that they would reprogram funds using Section 8005, they have uniformly described the object of that reprogramming as border barrier construction." Order 24.

3

Defendant Shanahan has since authorized transfer of an additional $1.5 billion to DHS for wall projects in Arizona and California. Order 11-12. Summary judgment briefing on both transfers will be completed on June 24, with decision expected on or about July 1. *See* Scheduling Order (ECF No. 164), (attached).

## ARGUMENT

The administration has made neither "a strong showing that [it] is likely to succeed on the merits," nor demonstrated irreparable injury. *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017) (citation omitted). Its failure to satisfy these "most critical factors" alone requires denying its stay request, without need to examine the remaining factors. *Id.* In any event, however, because a stay would injure both other parties and the public interest, Defendants' motion should be denied. *Id.*

## I. Defendants Have Not Made a Strong Showing That They Are Likely to Succeed on the Merits.

Defendants argue that: (a) Congress's enacted appropriations limitations are unreviewable and unenforceable; and (b) Congress never "denied" funding for wall construction, and the wall project was "unforeseen" until February 25, 2019. Defendants have not shown any likely success on these arguments, much less made a "strong showing."

**A.     Congress did not preclude review.**

Plaintiffs sought an injunction because Defendants' plan to circumvent congressional appropriations decisions violated the Constitution's Appropriations and Presentment Clauses, usurped Congress's exclusive prerogatives, and violated the CAA, resulting in injury to Plaintiffs. "The crux of Plaintiffs' case is that Defendants' methods for funding border barrier construction are unlawful." Order 27.

Defendants argue that once they have invoked Section 8005 to justify the appropriation, all inquiry must end and no court may review whether their claimed authority remotely fits within the statute's terms. Defendants are wrong.

The district court properly reviewed Plaintiffs' ultra vires challenge to Defendants' usurpation of Congress's exclusive role in appropriations, correctly holding that Plaintiffs need not show that Congress created a right of action under Section 8005. But even if Plaintiffs had to show that their claims are within the zone-of-interests of a *defense* to their claim of ultra vires action, Plaintiffs satisfy that test.

1. The district court correctly concluded that the zone-of-interests analysis is not required where, as here, Plaintiffs bring traditional equitable claims to enjoin federal officials from committing ultra vires acts. Order 29-30. As the Supreme Court explained, "where [an] officer's powers are limited by statute, his actions

beyond those limitations . . . are ultra vires his authority and therefore may be made the object of specific relief." *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949). Plaintiffs' "cause of action, which exists outside of the APA, allows courts to review ultra vires actions by the President that go beyond the scope of the President's statutory authority." *Hawaii v. Trump*, 878 F.3d 662, 682 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018).

Courts regularly review in equity whether a particular executive action exceeded constitutional or statutory authority. *See, e.g.*, *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187-88 (1993) (challenge to executive order issued under Immigration and Nationality Act); *Dames & Moore v. Regan*, 453 U.S. 654, 667 (1981) (reviewing whether officials' actions "were beyond their statutory and constitutional powers"); *Leedom v. Kyne*, 358 U.S. 184, 188-89 (1958) (challenge to executive order despite lack of final agency action); *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996) (review of presidential action through a challenge brought against Secretary of Labor).

As the lack of any discussion of a zone-of-interest limitation in these cases suggests, ultra vires review, also known as nonstatutory review, does not typically involve such an inquiry. *See Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 811 n.14 (D.C. Cir. 1987) ("Appellants need not, however, show that their interests fall within the zones of interests of the constitutional and statutory powers invoked by

6

the President in order to establish their standing to challenge the interdiction program as ultra vires."). The Supreme Court has since confirmed the limited applicability of the test to legislatively-created actions in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-30 (2014). The government's citations to zone-of-interests inquiries for "implied equitable causes of action under the Constitution," Mot. 12, predate *Lexmark*, which "recast the zone-of-interests inquiry as one of statutory interpretation." *Ray Charles Found. v. Robinson*, 795 F.3d 1109, 1120-21 (9th Cir. 2015).[1]

2. Even if Plaintiffs were required to satisfy a further zone-of-interest test with respect to Defendants' claimed Section 8005 authority, the test would pose no obstacle to the Court's review. *See Cook v. Billington*, 737 F.3d 767, 771 (D.C. Cir. 2013) (Kavanaugh, J.) (zone-of-interest test "poses a low bar"). "The test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish*

---

[1] Defendants rely on *Grupo Mexicano v. Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999), but that case stands for the unremarkable proposition that a court's equitable powers under statute do not include "the power to create remedies previously unknown to equitable jurisprudence," such as a creditor's prejudgment control of a debtor's assets. *Id.* at 332. The relief Plaintiffs request—halting ultra vires executive action—is "traditionally accorded by courts of equity." *Id*. at 319.

*Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (quotations omitted).

Defendants mistakenly suggest that a "heightened" zone-of-interests standard might apply here. Mot. 10. Even if such standard might apply in private disputes where "a private right of action under a statute is asserted," *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 400 n.16 (1987) (quoting *Cort v. Ash*, 422 U.S. 66 (1975)), this Court applies, at most, ordinary zone-of-interests analysis to actions seeking relief from government action. Thus, in a non-APA case that Defendants cite, this Court "determined whether [plaintiffs'] interests bear more than a marginal relationship to the purposes underlying the dormant Commerce Clause." *Individuals for Responsible Gov't, Inc. v. Washoe Cty. ex rel. Bd. of Cty. Comm'rs*, 110 F.3d 699, 703 (9th Cir. 1997); *see also, e.g.*, *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1122 (9th Cir. 2009). In such situations, the inquiry is causal: zone-of-interests requires only that an injury "somehow be tied to" a violation of the underlying statutory or constitutional purpose. *Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health*, 654 F.3d 919, 932 (9th Cir. 2011).[2]

---

[2] Additionally, if the Court views these claims as challenges arising under Section 8005, rather than nonstatutory ultra vires claims, it may treat them as APA claims on review. *See, e.g.*, *Alto v. Black*, 738 F.3d 1111, 1117 (9th Cir. 2013) (electing to consider under APA claims not "explicitly denominated as an APA claim" as they were "fairly characterized as claims for judicial review of agency action under the APA"); *Clouser v. Espy*, 42 F.3d 1522, 1533 (9th Cir. 1994) ("We shall therefore treat plaintiffs' arguments as being asserted under the APA,

Here, Plaintiffs' interest in avoiding circumvention of Congress's decision to deny funds is entirely aligned with Section 8005's purpose. Plaintiffs were involved with Congress's funding decisions with respect to the border wall, and repeatedly advocated with lawmakers to limit the scope and location of any construction. *See* Houle Decl. ¶ 7; Gaubeca Decl. ¶ 5. They now seek to enforce the denial of funds that Congress enacted in the CAA. *See Clarke*, 479 U.S. at 401 (zone-of-interests analysis "not limited to considering the statute under which respondents sued" but must consider "overall context" and "overall purposes" of congressional action). "[I]t is sufficient that the Organizations' asserted interests are consistent with and more than marginally related to the purposes of the [statute]." *E. Bay Sanctuary Covenant v. Trump* ("*EBSC*"), 909 F.3d 1219, 1244 (9th Cir. 2018). Plaintiffs' "stake in opposing" the use of Section 8005 to circumvent Congress's protection of the lands Plaintiffs treasure is "intense and obvious," and easily passes the "zone-of-interests test[, which] weeds out litigants who lack a sufficient interest in the controversy." *Patchak v. Salazar*, 632 F.3d

---

although plaintiffs sometimes have not framed them this way in their pleadings."); *Japan Whaling Ass'n. v. Am. Cetacean Soc'y*, 478 U.S. 221, 228, 230 n.4 (1986) (treating Mandamus Act petition as APA claim). The transfers are final agency decisions because "the initial agency decisionmaker arrived at a definitive position and put the decision into effect," *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 984-85 (9th Cir. 2006) (quotation omitted), leading directly to the challenged harms to Plaintiffs, Order 24-25.

702, 707 (D.C. Cir. 2011), *aff'd sub nom. Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209.

Defendants largely ignore the cardinal question of whether Plaintiffs' interests are inconsistent with the purpose of Section 8005 in favor of the sweeping claim that Section 8005 is unreviewable. Defendants argue that Section 8005 seeks to benefit Congress, concerns only predicate transfers rather than the ultimate use of funds, and bars review absent an affirmative indication of Congress's intent to create a cause of action. These arguments all fail.

First, *Patchak* forecloses Defendants' argument that Plaintiffs are not proper challengers because Section 8005 "regulates the relationship between Congress and the Executive" to Congress's benefit. Mot. 10. In *Patchak*, the Court held that a neighboring property owner could bring suit under a statute that "authorizes the acquisition of property 'for the purpose of providing land for Indians.'" 567 U.S. at 224. The neighbor asserted that an unauthorized acquisition of property would eventually cause him "economic, environmental, and aesthetic harm as a nearby property owner," because after its acquisition the property would be developed. *Id.*

As the Supreme Court explained, it was of no moment that the statute at issue did not "seek[] to benefit" the plaintiff, or that the plaintiffs' interests were "environmental" and "aesthetic." *Id.* at 225. That the plaintiff was "not an Indian or tribal official seeking land" and did not "claim an interest in advancing tribal

development . . . . is beside the point." *Id.* at 225 n.7 (quotation omitted). Nor did it matter that because Patchak's land was not acquired, he was not directly regulated by the statute. The zone-of-interests test imposes no such requirements.

Second, Defendants' suggestion that Plaintiffs' interests must be restricted to the unlawful 8005 transfer itself, rather than its use to divert funds to build the wall, cannot be squared with *Patchak.* There, the Court found "unpersuasive" the argument that mere violation of the acquisition statute, which "does not turn on any particular use of the land . . . has no impact on [Patchak] or his asserted interests." 567 U.S. at 225. What mattered was that when the agency used its statutory powers, it did "not do so in a vacuum," but rather acted "with at least one eye directed toward how tribes will use those lands . . . ." *Id.* at 226. And it was the *use* of the lands that Patchak objected to, as a nearby casino would inflict "environmental" and "aesthetic harm." *See also Patchak*, 632 F.3d at 707 (Patchak alleged "that the rural character of the area would be destroyed" and that "he would lose the enjoyment of the agricultural land surrounding the casino site").

"[F]rom start to finish, the decision whether to acquire the Bradley Property under § 465 involved questions of land use." *Patchak*, 567 U.S. at 227. Therefore, because "the statute's implementation centrally depends on the projected use of a given property," an objector to the eventual projected use of the land could sue under the predicate land acquisition and tribal development statute. *Id.* at 226-27.

11

Here too, Plaintiffs' claim turns centrally on the interests incorporated in the statute's implementation. From "start to finish, the decision whether" to transfer funds under Section 8005 "involved questions" of Congress's funding decisions with respect to border barriers, including Defendant Shanahan's explicit "finding" that Congress had not denied funds for the border wall and that its construction was an "unforeseen military requirement." "Since Defendants first announced that they would reprogram funds using Section 8005, they have uniformly described the object of that reprogramming as border barrier construction." Order 24. Plaintiffs, as parties injured by that implementation, "are reasonable—indeed, predictable—challengers of the Secretary's decisions." *Patchak*, 567 U.S. at 227-28.

Finally, Defendants' argument that Section 8005 requires an affirmative authorization of judicial enforcement turns the ordinary presumption of judicial review on its head. *See* Mot. 10. Defendants claim that "this is not a statute that anyone really has the authority to invoke." Hearing Tr. 98:04-05, *House v. Mnuchin*, No. 19-cv-969 (D.D.C. May 23, 2019) (attached). But this claim flies in the face of the "strong presumption favoring judicial review" of agency actions and the "heavy burden" to establish that Congress intended to preclude judicial review. *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1651 (2015). As then-Judge Kavanaugh observed, under the Supreme Court's "capacious view of the zone of

12

interests requirement," a "suit should be allowed unless the statute evinces discernible congressional intent to preclude review." *White Stallion Energy Ctr., LLC v. E.P.A.*, 748 F.3d 1222, 1269 (D.C. Cir. 2014) (Kavanaugh, J., concurring in part and dissenting in part), *rev'd sub nom. Michigan v. E.P.A.*, 135 S. Ct. 2699 (2015). Defendants have not shown such intent here.

### B. Defendants' plan to funnel $1 billion from the military to wall construction in Arizona and New Mexico is unlawful.

1. The district correctly held that Defendants were unlikely to show that they could invoke Section 8005 to funnel billions of dollars to DHS for wall construction. Section 8005 cannot be used when "the item for which funds are requested has been denied by the Congress." Pub. Law No. 115-245 § 8005. In addition, Section 8005 bars transfers unless "based on unforeseen military requirements." *Id*. Similar prohibitions are codified at 10 U.S.C § 2214(b).

The administration requested $5.7 billion to construct "approximately 234 miles of new physical barrier" across the southern border. Order 4. On February 14, 2019, Congress refused, appropriating a fraction of the money and explicitly limiting construction to eastern Texas. Eleven days later, DHS requested that DoD transfer billions to DHS to construct "approximately 218 miles" of barriers outside of Texas. Rapuano Decl., Ex. A at 10.

Faced with this unambiguous record, Defendants maintain that Congress's denial of the *entire* wall project outside of Texas is irrelevant, because Defendants

13

did not specifically and separately request funding for each *subsection* of wall outside of Texas. Mot. 15. In addition, because Defendants never specifically identified the "counter-narcotics support line" during the budget debate over wall construction, they argue that Congress did not explicitly deny that potential authority. Mot. 15.

Defendants' crabbed reading of "denied" has no basis in the language or logic of Section 8005. The statute's plain language refers to an "item" denied (such as the President's wall), and includes no reference to an item's subcomponents, requesting agency, or specific budget line. The district court did not err in finding that Defendants' interpretation of "denied" "is likely wrong, when the reality is that Congress was presented with—and declined to grant—a $5.7 billion request for border barrier construction." Order 34.

Moreover, Defendants' reading of "denied" would defeat the entire purpose of Section 8005 because the administration often simply (as it did here) requests items without reference to specific budget lines or subcomponents. According to Defendants, once funding for a project is denied, the administration is free to reallocate monies to each constituent subcomponent of the denied project. As the district court explained, such a reading would "render meaningless Congress's constitutionally-mandated power to assess proposed spending, then render its binding judgment as to the scope of permissible spending." Order 38.

Defendants' reading of "unforeseen" is equally flawed. It is not plausible that Congress intended its own decisions to deny funding to constitute "unforeseen" military requirements. For more than year before the March 2019 transfers, the administration requested, and Congress considered, the allocation of billions of dollars to build a border wall in these same lands. Order 35-36. The purported need for hundreds of miles of wall was unquestionably "foreseen by the government as a whole (even if DoD did not realize that it would be asked to pay for them until after Congress declined to appropriate funds requested by another agency)." Order 36.

Moreover, "if 'unforeseen' has the meaning that Defendants claim, Section 8005 would give the agency making a request for assistance under Section 284 complete control over whether that condition is met, simply by virtue of the timing of the request. As here, DHS could wait and see whether Congress granted a requested appropriation, then turn to DoD if Congress declined, and DoD could always characterize the resulting request as raising an 'unforeseen' requirement because it did not come earlier." Order 40.

Finally, although the district court did not need to reach Section 8005's "military requirement" prong, Order 36 n.17, the transfers fail this test as well. Building a permanent border wall on behalf of DHS is not a "military requirement." It is not a project to be carried out for any military purpose, but

instead is for civilian law enforcement purposes. *See* Rapuano Decl., Ex. C (CBP is "the proponent of the requested action," "DHS will accept custody" of the wall, "operate and maintain" it, and "account for that infrastructure in its real property records"); *see also* 6 U.S.C. § 202 (assigning DHS responsibility for "[s]ecuring the borders"). DoD's authority to provide limited support to civilian agencies, when Congress so appropriates, does not convert civilian enforcement requests to a "military requirement" justifying a Section 8005 transfer. If anything the military might do is deemed a "military requirement," the statutory phrase imposes no restriction at all. Such a reading violates the "presumption that statutory language is not superfluous." *McDonnell v. United States*, 136 S. Ct. 2355, 2369 (2016) (quotation marks omitted).

2. Although the district court did not need to decide whether Defendants' wall construction also exceeded any Section 284 authority, it noted that "reading the statute to suggest that Congress requires reporting of tiny projects but nonetheless has delegated authority to DoD to conduct the massive funnel-and-spend project proposed here is implausible, and likely would raise serious questions as to the constitutionality of such an interpretation." Order 39. In the past, Congress has approved of small-scale fencing projects that were one one-hundredth of the scope and expense of DoD's initial transfer of $1 billion to DHS. *See* H.R. Rep. No. 103-200, at 330-31 (1993).

It is not plausible that Section 284 contains within it a broad delegation of power to the Secretary of Defense to override Congress's specific decisions about funding of the border wall. *See F.D.A. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (interpretation of statutes "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude"). As the Supreme Court has instructed, "[w]e expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014) (citation omitted).

Finally, although the district court did not need to decide Plaintiffs' constitutional or CAA claims, it noted that "Congress has repeatedly rejected legislation that would have funded substantially broader border barrier construction," and that through the CAA it "decid[ed] in the end to appropriate only $1.375 billion." Order 38-39. Defendants' efforts to add billions to DHS's wall funding from general DoD accounts violates the established principle that when Congress expressly appropriates a specific amount, that "indicates that is all Congress intended" for a given project "to get in [a fiscal year] from whatever source." *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005). In exceeding the CAA's limits, Defendants violated both the Appropriations Clause and the CAA itself, usurping Congress's "exclusive" power "not only to formulate

17

legislative policies and mandate programs and projects, but also to establish their relative priority for the Nation." *United States v. McIntosh*, 833 F.3d 1163, 1172 (9th Cir. 2016).

Defendants argue that Congress "could have granted DoD unfettered discretion over its total budget," obviating separation-of-powers concerns. Mot. 17. But Congress did not, and in any event could not, permit the executive to override its enacted judgments. A statute would run afoul of the Presentment Clause if, as Defendants insist here, it permitted the president to sign an appropriations act and, "based on the same facts and circumstances that Congress considered," have the option of "rejecting the policy judgment made by Congress and relying on [its] own policy judgment." *Clinton v. City of New York*, 524 U.S. 417, 444 & n.35 (1998).

For these additional reasons, Defendants are unlikely to succeed on the merits.

* * *

Defendants argue that "[t]he real separation-of-powers concern is the district court's intrusion into the budgeting process." Mot. 17. "But if there is a separation-of-powers concern here, it is between the President and Congress, a boundary that [courts] are sometimes called upon to enforce." *EBSC*, 909 F.3d at 1250. As this Court recently admonished in denying a stay when the "Executive ha[d] attempted

an end-run around Congress": "Just as we may not, as we are often reminded, 'legislate from the bench,' neither may the Executive legislate from the Oval Office." *Id*. at 1250-51.

"In short, the position that when Congress declines the Executive's request to appropriate funds, the Executive nonetheless may simply find a way to spend those funds 'without Congress' does not square with fundamental separation of powers principles dating back to the earliest days of our Republic." Order 54-55. Defendants have not shown a strong likelihood of success.

## II. Defendants Have Not Shown Irreparable Harm.

1. Defendants' claims of harm "should the district court's preliminary injunction continue into the coming months," Mot. 22, are irrelevant given the extraordinarily time-limited nature of this preliminary injunction. Courts "must consider only the portion of the harm that would occur while the preliminary injunction is in place, and proportionally diminish total harms to reflect only the time when a preliminary injunction would be in place." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014). Here, such proportional diminishment must account for the fact that the injunction will almost certainly become moot within two weeks of argument. The district court has ordered the parties to complete briefing on partial summary judgment and a permanent injunction by June 24. *See* Scheduling Order. This date

was selected so that the district court can make a final decision on the merits before additional Section 284 construction projects are slated to begin on July 1.

2. Moreover, Defendants' sudden urgency to build the wall while this appeal is pending represents an abrupt shift from their previous course of conduct, undermining their claim of irreparable harm. As the district court noted, "although Congress appropriated $1.571 billion for physical barriers and associated technology along the Southwest border for fiscal year 2018," the record shows "as recently as April 30, 2019 that CBP represents it has only constructed 1.7 miles of fencing with that funding. . . . This representation tends to undermine Defendants' claim that irreparable harm will result if the funds at issue on this motion are not deployed immediately." Order 54 n.22; *see generally Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (unexplained delay weighs against finding "urgent need" for injunction because it demonstrates "lack of need for speedy action" (citation omitted)).

3. Defendants also argue that they will be responsible for contractual penalties without a stay. But any contractual liability results from Defendants' own strategic choices about how to proceed in the face of litigation. Defendants awarded the contracts at issue on April 9, after the motion for a preliminary injunction was filed, and on May 15, two days before the hearing. McFadden Decl. (ECF No. 146-2), (attached to Motion) ¶ 10. It would be inequitable to permit

Defendants to affect the balance of hardships by incurring new and unlawful obligations during the course of litigation over this motion. *See Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002) (holding that "financial" impacts could not overcome environmental harms where such impacts "may be self-inflicted").

4. Finally, Defendants argue that they will be irreparably harmed if they cannot obligate funds before the end of the fiscal year, because at that point Congress would have to re-appropriate the funds they seek to use. Mot. 21-22. But if Congress in fact permitted their use of Sections 8005 and 284, Defendants would have no reason to fear irrevocably losing power to transfer taxpayer funds to wall construction. Moreover, if Defendants were to prevail on the merits, courts have "repeatedly reaffirmed the power of the courts to order that funds be held available beyond their statutory lapse date if equity so requires." *Connecticut v. Schweiker*, 684 F.2d 979, 997 (D.C. Cir. 1982).

## III.    The Equities and Public Interest Support the District Court's Injunction.

1. Congress considered, and rejected, the same argument Defendants make here: that a border wall is urgently needed to combat drugs. The administration specifically supported its Fiscal Year 2019 budget request with the claim that a border barrier "is critical to combating the scourge of drug addiction that leads to thousands of unnecessary deaths." Order 34 (quotation omitted). At bottom, Congress has already considered the public interest Defendants claim here, and

decided that it does not justify urgent expenditure of billions of taxpayer dollars on wall construction in Arizona and New Mexico.

Defendants request that the Court allow them to override the balance struck by Congress earlier this year so they may construct a permanent wall this summer, before Congress has a chance to consider and pass another budget. Defendants' efforts to circumvent congressional control of the budget are contrary to the public interest. *See EBSC*, 909 F.3d at 1255 ("[T]he public also has an interest in ensuring that 'statutes enacted by [their] representatives' are not imperiled by executive fiat." (quoting *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers)).

2. Moreover, the administration's own assessments undermine Defendants' claim that a stay here is urgently needed so as to significantly block "deadly heroin and fentanyl" from "flowing into our Nation." Mot. 1. According to the Drug Enforcement Agency's most recent assessment, the "majority of the [heroin] flow is through [privately operated vehicles] entering the United States at legal ports of entry, followed by tractor-trailers, where the heroin is co-mingled with legal goods." DEA, 2018 National Drug Threat Assessment at 19 (Oct. 2018), https://tinyurl.com/yaqyh3ld. Only "a small percentage of all heroin seized by CBP along the land border was between Ports of Entry." *Id.* Fentanyl transiting the

Southern border is likewise most commonly smuggled in "multi-kilogram loads" in vehicles crossing at legal ports of entry. *Id.* at 33.

Defendants have not disputed the DEA's conclusions, and their submissions do not justify disregarding normal appellate processes and upending Congress's recent decision to restrict wall funding and locations. *See Washington v. Trump*, 847 F.3d at 1168 ("Despite the district court's and our own repeated invitations to explain the urgent need for the Executive Order to be placed immediately into effect, the Government submitted no evidence to rebut the States' argument that the district court's order merely returned the nation temporarily to the position it has occupied for many previous years.").

3. Because the environmental effects of a billion-dollar construction project are effectively impossible to undo, the balance of harms favors an injunction. This Court has determined that, "when environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988) (quotation marks omitted); *see also League of Wilderness Defs.*, 752 F.3d at 765 (balance favored injunction where environmental harms were "permanent" while the injunction imposed "temporary delay"). Defendants not only mischaracterize these lasting and significant harms, but also ignore that the harms they assert flow from overriding Congress's considered appropriations decision.

Defendants' reliance on *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), is misplaced. Not only was the asserted harm to the government there far more direct and unambiguous, but, critically, the challenged injunction was both unrelated to the merits and upended the status quo. As the Court explained, because there was no claim that the Navy "must cease sonar training, there [wa]s no basis for enjoining such training in a manner credibly alleged to pose a serious threat to national security." *Id.* at 32-33. Moreover, the injunction drastically altered the status quo: at that point "training ha[d] been going on for 40 years with no documented episode of harm." *Id.* at 33.

Here, by contrast, "a stay of the district court's order would not preserve the status quo: it would upend it, as the [injunction] has temporarily restored the law to what it had been for many years prior . . . ." *EBSC*, 909 F.3d at 1255. As the district court held, "Defendants' request to proceed immediately with the enjoined construction would not preserve the status quo pending resolution of the merits of Plaintiffs' claims, and would instead effectively moot those claims." Stay Denial Order 2 (ECF No. 152), (attached).

## CONCLUSION

Defendants' request for a stay should be denied.

Dated: June 11, 2019

Respectfully submitted,

*/s/ Dror Ladin*

Mollie M. Lee (SBN 251404)
Christine P. Sun (SBN 218701)
American Civil Liberties Union
    Foundation of Northern
    California, Inc.
39 Drumm Street
San Francisco, CA 94111
Tel.: (415) 621-2493
Fax: (415) 255-8437
mlee@aclunc.org
csun@aclunc.org

David Donatti
Andre I. Segura (SBN 247681)
American Civil Liberties Union
    Foundation of Texas
P.O. Box 8306
Houston, TX 77288
Tel.: (713) 325-7011
Fax: (713) 942-8966
ddonatti@aclutx.org
asegura@aclutx.org

*Attorneys for Plaintiffs-Appellees*

*\*Attorneys for Plaintiff-Appellee*
   *Sierra Club*

Dror Ladin
Noor Zafar
Jonathan Hafetz
Hina Shamsi
Omar C. Jadwat
American Civil Liberties Union
    Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2660
Fax: (212) 549-2564
dladin@aclu.org
nzafar@aclu.org
jhafetz@aclu.org
hshamsi@aclu.org
ojadwat@aclu.org

Cecilia D. Wang (SBN 187782)
American Civil Liberties Union
    Foundation
39 Drumm Street
San Francisco, CA 94111
Tel.: (415) 343-0770
Fax: (415) 395-0950
cwang@aclu.org

Sanjay Narayan (SBN 183227)\*
Gloria D. Smith (SBN 200824)\*
Sierra Club Environmental Law
    Program
2101 Webster Street, Suite 1300
Oakland, CA 94612
Tel.: (415) 977-5772
sanjay.narayan@sierraclub.org
gloria.smith@sierraclub.org

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2019, I electronically filed the foregoing with the Clerk for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. All participants in this case are registered CM/ECF users and will be served by the appellate CM/ECF system. There are no unregistered participants.

 */s/ Dror Ladin*
Dror Ladin
Dated: June 11, 2019

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing motion complies with the type-volume limitation of Fed. R. App. P. 27 because it contains 5,562 words. This brief complies with the typeface and the type style requirements of Fed. R. App. P. 27 because this brief has been prepared in a proportionally spaced typeface using Word 14-point Times New Roman typeface.

_/s/ Dror Ladin_
Dror Ladin
Dated: June 11, 2019